UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FLEXIWORLD TECHNOLOGIES INC., <br><br>Plaintiff, <br><br>v. <br><br>AMAZON.COM INC. et al., <br><br>Defendants. | CASE NO. 2:21-cv-01055-DGE <br><br> ORDER REGARDING CLAIMS CONSTRUCTION |

This matter comes before the Court on the parties' briefs and proposed patent claim constructions. The Court held oral argument regarding claims construction pursuant to *Markman v. Westview Instruments, Inc*., 52 F.3d 967 (Fed. Cir. 1995). Having reviewed the parties' proposed claim constructions and having considered the arguments and evidence presented in the Markman hearing, the Court makes the following rulings concerning the patent claim terms at issue in this matter.

## I. BACKGROUND

On June 22, 2020, Plaintiff Flexiworld Technologies, Inc. ("Flexiworld") filed a lawsuit in the United States District Court for the Western District of Texas, alleging that Amazon infringed ten of its patents (collectively, the "Patents-in-Suit"). (Dkt. No. 1.) Flexiworld contends the technology embodied in Amazon's Echo and Fire devices infringes its patents. (*Id.* at 11–12.) The case was assigned to Judge Alan Albright. On January 28, 2021, Judge Albright emailed the parties with preliminary claims constructions in advance of the Markman hearing. (Dkt. No. 127-1 at 3–12.) On January 29, 2021, Judge Albright held a Markman hearing. (Dkt. No. 127-2.) After hearing argument, Judge Albright orally adopted several of his preliminary constructions and altered others. (*Id.*)

On August 9, 2021, the case was transferred to the Western District of Washington. (Dkt. No. 99.) On February 10, 2023, the Court issued a minute order finding that a new Markman hearing was warranted. (Dkt. No. 131.) On February 23, 2023, the parties made technology presentations for the Court via Zoom, explaining the patents at issue and the technology underlying them. (Dkt. No. 136.) The Court directed the parties to file new briefs, even if repetitive of previous filings before Judge Albright. (*Id.*) The parties filed new opening and responsive briefs, along with a statement of the claim terms that remain in dispute. (Dkt. Nos. 141, 142, 143, 144, 147, 148, 149.) On October 16, 2023, the Court held a new Markman hearing. (Dkt. No. 153.)

## II. THE PATENTS-IN-SUIT

Flexiworld alleges Amazon infringed ten of its patents, specifically United States Patent numbers:

1) 8,332,521 ("the '521 Patent");

2) 8,989,064 ("the '064 Patent");

3) 9,110,622 ("the '622 Patent");

4) 10,133,527 ("the '527 Patent");

5) 10,140,072 ("the '072 Patent");

6) 10,162,596 ("the '596 Patent");

7) 10,387,087 ("the '087 Patent");

8) 10,481,846 ("the '846 Patent");

9) 10,489,096 ("the '096 Patent"); and

10) 10,642,576 ("the '576 Patent").

(Dkt. No. 1. at 4-10.)  Flexiworld agreed to dismiss from this action all allegations that Amazon infringes the '064 Patent.  (Dkt. No. 149.)

### III.  SUMMARY OF CLAIMS FOR CONSTRUCTION

The parties submitted a Joint Claim Construction and Prehearing Statement that identified disputed claim terms.  (Dkt. No. 149.)  The parties disagree on the constructions for the following terms:

- "Output Manager Software"
- "Data Generation Software Component"
- "Physical Distance/Physical Proximity"
- "Authentication Procedure"

(*Id.* at 2–7.)

### IV. PRINCIPLES OF CLAIM CONSTRUCTION

#### A. Claim Interpretation and Indefiniteness

"[T]he ultimate issue of proper construction of a claim should be treated as a question of law[.]" *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015). However, "subsidiary factfinding is sometimes necessary." *Id*. In such case, any underlying factual determinations are reviewed for clear error. *Id*. at 322.'

When interpreting claims, the primary focus should be on the intrinsic evidence of record, which consists of the claims, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–1317 (Fed. Cir. 2005) (en banc). The Court should begin by examining the claim language. *Id.* at 1312. A court should generally give the claim words their "ordinary and customary meaning." *Id.* at 1312–1313 (quotation omitted). Claim language should be viewed through the lens of a person of "ordinary skill in the relevant art at the time of the invention." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1283 (Fed. Cir. 2005). Claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979).

Although courts are permitted to consider extrinsic evidence, like expert testimony, dictionaries, and treatises, such evidence is generally of less significance than the intrinsic record. *Phillips*, 415 F.3d at 1317 (internal citation omitted). Extrinsic evidence may not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id*. at 1324.

"A patent is invalid for indefiniteness if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in

the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898–899 (2014). "Indefiniteness is a legal determination; if the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015) (citation omitted).

### B. Means-Plus-Function Claims

Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes 35 U.S.C. § 112, ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

"A means-plus-function claims construction analysis involves a two-step process." *WSOU Investments LLC v. Google LLC*, 2023 WL 6889033, *2 (Fed. Cir. Oct. 19, 2023). The first step evaluates whether the claim limitation is drafted in a means-plus-function configuration with the critical question being "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).

> If the claim limitation does connote sufficiently definite structure, it is not written in a mean-plus-function format and § 112 ¶ 6 does not apply. However, if the claim limitation is written in means-plus-function format, we continue to step two, which requires us to determine 'what structure, if any, disclosed in the specification corresponds to the claimed function.'

*WSOU Investments, LLC*, 2023 WL 6889033 at *2 (quoting *Williamson*, 792 F.3d at 1351).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson*, 792 F.3d at 1348. "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger

ORDER REGARDING CLAIMS CONSTRUCTION - 5

demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id*. at 1349. "Where there are multiple claimed functions . . . , the patentee must disclose adequate corresponding structure to perform all of the claimed functions. If the patentee fails to disclose adequate corresponding structure, the claim is indefinite." *Id*. at 1351–1352 (internal citation omitted).

Here, Amazon carries the burden of establishing that the disputed claim terms are subject to § 112, ¶ 6. This burden is "without . . . any heightened evidentiary showing[.]" *Id*. at 1349.

## V.     TERMS FOR CONSTRUCTION

### A.     "Output Manager Software"

The parties dispute the claim term "output manager software." This term appears several times in claim 15 of the '521 patent:

> An Internet-Pad including *output manager software* for managing output or rendering of digital content to a wireless output device, said Internet-Pad being a wireless mobile information apparatus and including:
>
> a digital Pad with access to the Internet,
>
> a touch sensitive screen,
>
> a digital camera,
>
> an image acquisition function,
>
> a graphical user interface for interacting with a user over the said touch sensitive screen,
>
> an e-mail application, that includes a graphical user interface over the touch sensitive screen for selecting by the user, icons, or functions of the e-mail application,
>
> a processing unit,
>
> a memory unit for storing at least part of the digital content,
>
> an Internet-Pad operating system having an object model or an application programming interface (API) for communicating with the *output manager software*,
>
> a wireless communication unit that includes a radio frequency link controller and an antenna for establishing radio frequency wireless communication

> connection between the Internet-Pad and a selected wireless output device that is a distinct device from the Internet-Pad, and
>
> *output manager software*, executable by the processor unit at the Internet-Pad, for communicating with the operating system of the Internet-Pad over the object model or the application programming interface (API) provided by the Internet-Pad operating system;
>
> *output manager software*, executable by the processing unit at the Internet-Pad, for obtaining, authentication or security information provided by the user;
>
> *output manager software*, executable by the processing unit at the Internet-Pad, for receiving, by the output manager and from the graphical use interface, at least an indication related to a selected digital content from the user over the touch sensitive screen of the Internet-Pad;
>
> *output manager software*, executable by the processing unit at the Internet-Pad, for receiving at least part of the selected digital content facilitated, at least in part, by the object model or the application programming interface (API) provided by the Internet-Pad operating system;
>
> *output manager software*, executable by the processing unit at the Internet-Pad, for receiving, at the Internet-Pad and over said established radio frequency wireless communication connection, one or more software components or data from the selected wireless output device;
>
> *output manager software*, executable by the processing unit at the Internet-Pad, for conforming at least part of the selected digital content into output data, the conforming of the output data being in accordance to a format, a language or an instruction suitable for sending to the selected wireless output device over the established radio frequency wireless communication connection; and
>
> *output manager software*, executable by the processing unit at the Internet-Pad, for sending at least part of the output data for output or rendering of at least part of the selected digital content at the selected wireless output device over the established radio frequency wireless communication connection;
>
> whereby, the *output manager software*, enables the user to send at least part of the selected digital content from the wireless communication unit of the Internet-Pad to the selected wireless output device over the established radio frequency wireless communication connection between the Internet-Pad and the selected wireless output device, and the selected digital content being selected by the user over the touch sensitive screen from the internet-Pad.

ORDER REGARDING CLAIMS CONSTRUCTION - 7

(Dkt. No. 144-10 at 35) (emphasis added).  As shown, "output manager software" is associated with eight functions described in the '521 patent.  However, the parties dispute only the following four functions[1]:

> 1. "output manager software, executable by the processor unit at the Internet-Pad, *for obtaining*, authentication or security information provided by the user"
>
> 2. "output manager software, executable by the processor unit at the Internet-Pad, *for receiving* at least part of the selected digital content facilitated, at least in part, by the object model or the application programming interface (API) provided by the Internet-Pad operating system"
>
> 3. "output manager software, executable by the processor unit at the Internet-Pad, *for receiving*, at the Internet-Pad and over said established radio frequency wireless communication connection, one or more software components or data from the selected wireless output device"
>
> 4. "output manager software, executable by the processor unit at the Internet-Pad, *for conforming* at least part of the selected digital content into output data, the conforming of the output data being in accordance to a format, a language or an instruction suitable for sending to the selected wireless output device over the established radio frequency wireless communication connection"

(Dkt. No. 149 at 3) (emphasis added).

Amazon argues Claim 15 of the '521 patent is indefinite and invalid because it fails to disclose sufficient structure for any of the claimed functions performed by the "output manager software." (Dkt. No. 142 at 19.)  Amazon contends the patent relies on "output manager software" to perform eight separate functions, but contends the claims and specifications never explain how the software achieves the claimed results.  (*Id*. at 20.)

---

[1] Amazon maintains all eight functions performed by the "output manager software" are indefinite, but does not address the remaining four functions in its brief due to limits imposed by Judge Albright concerning the number of terms to be construed. (Dkt. No. 142 at 20, n.7.)

ORDER REGARDING CLAIMS CONSTRUCTION - 8

Flexiworld asserts the term "output manager software" is not a nonce word; rather, it is similar to terms such as "software", "program", or "code" which connote sufficient structure to avoid invocation of § 112, ¶ 6. (Dkt. No. 143 at 13.) Quoting *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298–1299 (Fed. Cir. 2014), Flexiworld notes that "requiring traditional physical structure in software limitations lacking the term means would result in all those limitations being construed as a means-plus-function limitations[.]" (*Id.*) However, "the 'structure' of computer software is understood through, for example, an outline of an algorithm, a flowchart, or a specific set of instructions or rules." *Apple, Inc.*, 757 F.3d at 1298. Nonetheless, structure can be present where "a person of ordinary skill in the art could reasonably discern from the claim language that the words [used in the claim] . . . are used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional programs or code, existing in prior art at the time of the invention." *Zeroclick, LLC v. Apple, Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018).

To support its position, Flexiworld and its expert identify that "numerous output manager software programs existed and were available for purchase at the time [of the claim]." (Dkt. Nos. 143-1 at 14–15; 143 at 14; 144-1–144-10.) This included software products offered by companies, such as Tivoli, Dazel, and Cypress, at the time of the claimed invention. At the Markman hearing, Flexiworld specifically argued these companies had "output manager software" capable of performing all the disputed functions at the time of the claim. (Dkt. No. 160 at 38–48.)

Regarding "output manager software . . . for obtaining, authentication or security information provided by the user," the Tivoli product provided "Secured, Centralized Administration of Output: using the administrative interface, operators can easily define,

logically group and assign authorizations to users and output resources." (Dkt. No. 144-5 at 3.) Some published articles describing output management products and systems also noted that the term "output management" covers a range of products and that some of the products and systems "provide a centralized driving engine that has a significant amount of intelligence." (Dkt. No. 144-7 at 2.) In describing report management systems in existence, such systems "let[] large numbers of users view reports (or sections of them), but there are security provisions so that users can only see what they are authorized to see." (*Id*. at 3.) It, therefore, appears existing output manager software products could perform the function of "obtaining, authentication or security information provided by the user" as contained in the claim limitation.

Regarding "output manager software . . . for receiving at least part of the selected digital content," this function appears to have been one of the main points of the products marketed by existing companies. For example, Tivoli's product was capable of "confirm[ing] file contents, check[ing] output for accuracy and deliver[ing] output in multiple formats according to rules set by the administrator." (Dkt. No. 144-5 at 3.) Cypress' product was capable of "manag[ing], retriev[ing] and print[ing] disparate documents." (Dkt. No. 144-8 at 2.) It "store[d] and retrieve[d] high fidelity documents, both structured and unstructured, authored on disparate applications and platforms; send[ing] them to any device and has them print properly[.]' (*Id*.) In light of these reported functions, it appears that existing output manager software products had the ability to perform the claimed function of "receiving at least part of the selected digital content."

Regarding "output manager software . . . for receiving . . . one or more software components or data from the selected wireless output device," the same analysis applies with the prior claim function of receiving at least part of the selected digital content. Again, based on the

reports functions of existing products, there appeared to exist output manager software products capable of performing the function of receiving data authored on "disparate applications and platforms," which, presumably, requires "receiving . . . one or more software components or data from" selected output devices.

Regarding "output manager software . . . for conforming at least part of the selected digital content into output data, the conforming of the output data being in accordance to a format, a language or an instruction suitable for sending to" the output device, this appears to have been a key function of existing output manager software products. "Cypress' business advantage is that it stores and retrieves high fidelity documents, both structured and unstructured, authored on disparate applications and platforms; sends them to any device and has them print properly[.]" (Dkt. No. 144-8 at 2.) "[T]he Dazel server translates output for delivery." (Dkt. No. 144-6 at 2.) Tivoli "confirms file contents, checks output for accuracy and delivers output in multiple formats according to rules set by the administrator." (Dkt. No. 144-5 at 3.) Printing from disparate applications and platforms, translating output for delivery, or delivering output in multiple formats, all require some form of "conforming . . . selected digital content into output data . . . suitable for sending" to an output device.

In summary, Flexiworld has identified output manager software products that appear to have had the capability of performing the functions identified in the disputed claim limitation. As a result, the Court concludes persons of ordinary skill in the art would have understood "output manager software" to have a sufficiently definite meaning as the name for structure. Amazon has not overcome the presumption that § 112, ¶ 6 does not apply. Therefore, "output manager software" is not indefinite, and no additional construction is required.

B.   **"Data Generation Software Component"**

The parties dispute the claim term "data generation software component." It appears in claim 7 of the '846 patent:

> A system that includes an information apparatus and application software executable at the information apparatus for printing digital content from the application software of the information apparatus to a printer, and the information apparatus prints, at least part of, the digital content at the printer without using, at the information apparatus, a printer driver that is specific to the printer, the information apparatus includes:
>
>> one or more processors;
>>
>> a communication interface for establishing a local area network connection to a local area network; and
>>
>> one or more memory or storage devices storing software components, the software components include:
>>
>> . . .
>>
>> a *data generation software component* for generating, using the one or more processors, print data related, at least in part, to digital content, the generating of the print data is based, at least in part, on the device information received from the printer; and
>>
>> . . .
>>
>> wherein at least part of the application software is stored in the one or more memory or storage devices of the information apparatus, and execution of at least part of the application software, by the one or more processors of the information apparatus, causes the information apparatus to:
>>
>> . . .
>>
>> (4) use the *data generation software component*, to generate, at the information apparatus, the print data from at least part of the digital content obtained in (1), the generating of the print data based, at least in part, on the device information received from the printer in (3) and the generated print data conforms, at least in part to the language information or the format information individually or in any combination, that is included in the device information received from the printer in (3)[.]

(Dkt. No. 144-14 at 46–47) (emphasis added).

Amazon argues "data generation software component" is a nonce term that does not impart structure to perform the claimed function. (Dkt. No. 142 at 27.) Amazon contends the terms "component" is used purely in terms of the function it performs and does not explain how

ORDER REGARDING CLAIMS CONSTRUCTION - 12

it obtains device information, how it can process the information without the use of a device-specific driver, or how it interprets and analyzes that information to generate print data. (*Id.* at 27–28.) Amazon further contends the term "data generation" describes the software component's intended function rather than connoting any structure. (*Id.* at 28.) Amazon also argues that "almost any software component generates data" and therefore can be described as a "data generation software component." (*Id.*)

In *WSOU Investments LLC*, the limitation at issue stated "'at least one memory and the computer program code are configured, with the at least one processor, to cause the apparatus to' accomplish various functions." 2023 WL 6889033, *4. The Federal Circuit found this "claim language itself provides structural guidance," concluding that "[t]hough terms like 'computer program code,' 'memory,' and 'processor' may be broad, the recited combination of these multiple broadly named structures informs the skill artisan's relative understanding of what each structure is and what it is not, as well as how the various structures relate to another." *Id*. "We have explained that claim limitations like the recited 'computer program code,' when combined with a description of what the code is intended to accomplish, convey definite structure to the ordinarily skilled artisan." *Id*. at 5.

In this case, claim 7 of the '846 patent identifies an "information apparatus" using "application software . . . for printing digital content . . . to a printer." The information apparatus includes "one or more processors" and "one or more memory or storage devices storing software components" that include a "data generation software component for generating, using the one or more processors." The processors utilizing the application software "stored in one or more memory or storage devices . . . causes the information apparatus to . . . use the data generation software component, to generate . . . the print data" sent to the printer.

ORDER REGARDING CLAIMS CONSTRUCTION - 13

The Court concludes an ordinarily skilled artisan would have had knowledge that most computer software had some type of data generation component for printing content. As in *WSOU Investments LLC*, the Court concludes claim 7 combines the term "data generation software component" with a description of what it was intended to accomplish (generate print data), thereby conveying definite structure to the ordinarily skilled artisan.

Accordingly, "data generation software component" is not subject to § 112, ¶ 6, is not indefinite, and no additional construction is required.

C.     **"Physical Distance/Physical Proximity"**

The parties dispute "physical distance" and "physical proximity," both of which appear in claim 1 of the '087 patent. The parties dispute whether the following claim language is indefinite:

> the wireless discovery process is based, at least in part, on physical proximity between the smart phone and the output system for short range wireless communication, and the wireless discovery process is further based, at least in part, on the output system being within a physical distance from the smart phone.

(Dkt. No. 144-13 at 45.)

Amazon contends claim 1 of the '087 patent is indefinite because a person of ordinary skill in the art would be unable to determine with reasonable certainty how the claimed wireless discovery process works. (Dkt. No. 142 at 30.) Amazon argues Flexiworld's use of the word "further" in the claim suggests the "physical distance" requirement is different from, and adds an additional restriction beyond, the "physical proximity" requirement. (*Id.*) Amazon contends that despite this, the language of the claims otherwise indicates that the "physical distance" and "physical proximity" requirements are the same. (*Id.* at 31.)

The Court disagrees. As stated during the Markman hearing, there are instances where proximity can mean something other than distance. A device may be within physical proximity

of another device such that the devices recognize they are within a certain range of one another. At the same time, their actual ability to exchange information can depend on the physical distance between each device. (*See* Dkt. No. 160 at 98.)

Therefore, while the usage of the terms "physical proximity" and "physical distance" in the claim language may initially seem odd, the Court cannot say these terms are indefinite. A skilled artisan would likely understand that when these two terms appear in a claim in the context of wireless communications, "physical proximity" and "physical distance" are two different things; one referring to the range of the devices and the other referring to the physical space between the devices. *See SecureNova v. HTC*, Case No. 2:13–CV–904–WCB–RSP 2014 WL 7141099, at *8 (E.D. Tex. Dec. 15, 2014) ("The Court acknowledges that although proximity, as used in the patent, is a function of distance, other variables may affect the distance that constitutes "proximity" in particular cases.").

Accordingly, "physical proximity" and "physical distance" should be given their plain and ordinary meanings.

### D. "Authentication Procedure"

The final term in dispute is "authentication procedure" which appears in claims 1, 8, and 16 of the '527 patent and claims 1 and 16 of the '072 patent.

Flexiworld contends this term is readily understandable, unambiguous, and does not require construction. (Dkt. No. 143 at 29.) Flexiworld contends the term should be given its plain and ordinary meaning. (*Id.*) Amazon contends this term must be construed in a way that makes clear to the jury that the "authentication procedure" referenced in the above-mentioned patents requires receiving and comparing information to authenticate identity, rather than just transmitting or receiving authentication information. (*Id.* at 31–32.) Amazon proposes this term

be construed to mean "receiving authentication information and comparing to stored information to authenticate identity." (Dkt. No. 155-1 at 53.)

Although claim construction is matter of law within the sole province of a judge, the Court must be cognizant of the eventual involvement of a jury. *Control Res., Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2001). The purpose of claim construction is to discern the meaning a person of ordinary skill in the art would have attributed to a disputed term and then to convey that meaning understandably to a lay jury. *Big D Indus., Inc. v. Fresh Prod., Inc.*, Case No. CIV-21-211-F, 2022 WL 1017908 at *2 (W.D. Okla. April 5, 2022). However, claims "must be translated into plain English so that a jury will understand." *Control Res.*, 133 F. Supp. at 127.

Amazon's proposed construction clarifies the meaning of this term and will be helpful to the jury. It will be difficult for a jury to understand how an "authentication procedure" works if it is not clear that the procedure involves a comparison to stored information to verify the identity of a user or device. Accordingly, the Court adopts Amazon's proposed construction.

## VI.   ORDER[2]

For the foregoing reasons, the Court rules as follows:

1) The term "output manager software" and the disputed function terms are not subject to § 112, ¶ 6 and no additional construction is required.

2) The term "data software generation component" is not subject to § 112, ¶ 6 and no additional construction is required.

---

[2] Amazon asserted during the Markman hearing that regardless of the results of the claim construction, the scope of the asserted claims is limited to printing, not video or audio. The Court offers no ruling or comment on the scope of the asserted claims and will wait for the parties to submit an appropriate motion to fully present the issue to the Court for consideration.

3) The terms "physical proximity" and "physical distance" shall be given their plain and ordinary meanings.

4) The term "authentication procedure" is construed as follows: "receiving authentication information and comparing to stored information to authenticate identity."

Dated this 5th day of March, 2024.

David G. Estudillo
United States District Judge

ORDER REGARDING CLAIMS CONSTRUCTION - 17